Entered on Docket
November 17, 2014
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed and Filed: November 14, 2014

_____
**THOMAS E. CARLSON U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case No. 08-30991 TEC |
| WILLIAM JAMES DEL BIAGGIO, III, aka "BOOTS" DEL BIAGGIO, | ) Chapter 11 |
| Debtor. | ) |

**MEMORANDUM RE MOTION TO ENFORCE INDEMNITY OBLIGATION**

The court held a hearing on September 26, 2014 regarding the motion by the Liquidating Trust Committee to enforce an indemnity agreement against Predators Holdings, LLC (the Motion). Michael H. Ahrens appeared for the Committee. Craig Stuppi appeared for Predators Holdings, LLC (Holdings). Merle C. Meyers appeared for creditor David Freeman. Upon due consideration, and for the reasons set forth below, the Motion is denied.

BACKGROUND

Debtor William Del Biaggio filed a chapter 11 petition in this court on June 6, 2008. The court appointed a chapter 11 trustee on June 26, 2008.

The assets of Debtor's bankruptcy estate (the Estate) included

MEMORANDUM RE MOTION TO
ENFORCE INDEMNITY OBLIGATION
-1-

an interest in the Nashville Predators National Hockey League franchise (the Hockey Club). The claims against the Estate include a claim filed by David Freeman, who asserts that Debtor fraudulently induced him to invest in the Hockey Club, and that he suffered a loss of $29 million as a result (the Freeman Claim).

The official creditors' committee objected to the Freeman Claim on two grounds: (1) that the claim is not valid under non-bankruptcy law; and (2) that it should be subordinated to the claims of all other creditors pursuant to section 510(b) of the Bankruptcy Code, because it arises from the purchase of an equity security. This court determined that the claim should be subordinated under section 510(b). The District Court affirmed. Mr. Freeman's appeal to the Ninth Circuit is pending.

A chapter 11 plan (the Plan) was confirmed on September 22, 2011. Under the Plan, the Freeman Claim is considered a disputed claim until all appeals are resolved. The Plan requires the creation of a disputed claims reserve: when making a distribution to the holders of allowed claims, the liquidating trust must reserve an amount sufficient to pay the same percentage dividend to each disputed claim, to ensure equal distribution should the disputed claim later be allowed. The reserve for the Freeman Claim is $3.2 million.

The Trustee sold the Estate's interest in the Hockey Club to other owners of the team, including respondent Holdings (the Purchasers). The price for the Estate's interest in the team included the elimination of all claims against the Estate that might be asserted by Mr. Freeman and the other current and former owners. Most of the owners simply released their claims against

the Estate. Because Mr. Freeman refused to release his claim, and because the Trustee, the creditors' committee, and the owners all disputed the validity of the Freeman Claim, the Purchasers eliminated the Freeman Claim as a liability of the Estate by agreeing to defend and indemnify the estate with regard to the Freeman Claim (the Indemnity Agreement). The Indemnity Agreement permits the Purchasers to contest the Freeman Claim, and protects the Estate from having to pay either the cost of disputing the claim or any damages that might be awarded to Mr. Freeman.

The parties to the Indemnity Agreement are the Estate (referred to in the Agreement as Assignor), and the Purchasers (referred to in the Agreement as Assignees). The liabilities covered by the Indemnity Agreement include the Freeman Claim to the extent that claim is "valid and enforceable." The Agreement requires the Purchasers to:

> indemnify, defend (with counsel satisfactory to Assignor), protect and save and hold harmless Assignor, Debtor and the Estate of, from and against any and all losses, claims, ... liabilities, obligations, costs and expenses (including, without limitation, all court costs and attorneys' fees) as Assignor, Debtor and/or the Estate may suffer or incur in connection with [the Freeman Claim].

Paragraph 2 (ii) of Indemnity Agreement.

ARGUMENTS

The Committee contends that the establishment of the Freeman Reserve is a "loss" or "liability" requiring the Purchasers to perform under the Indemnity Agreement. This is so, the Committee argues, because the funding of the Reserve was a transfer of cash that depleted the amount available to pay creditors holding allowed claims. The Committee contends that the Indemnity Agreement

**MEMORANDUM RE MOTION TO
ENFORCE INDEMNITY OBLIGATION**

-3-

requires the Purchasers to fund the Freeman Reserve.

The Purchasers do not dispute that the Indemnity Agreement requires them to defend against the Freeman Claim and to assume the Estate's liability regarding that claim should it become an allowed unsubordinated claim. The Purchasers do dispute that they are required to pay Mr. Freeman or to fund the Freeman Reserve while the Freeman Claim is still being litigated.

DISCUSSION

The Committee's argument that the funding of the disputed claims reserve is a "loss" or "liability" under the Indemnity Agreement is unpersuasive, because the Estate (not its creditors) is the party protected under the Indemnity Agreement, and because the Estate suffered no loss in funding the Freeman Reserve – it merely shifted funds from one of its accounts to another. The funding of the Freeman Reserve harms creditors to some extent by delaying distributions until the Freeman Claim is resolved, but creditors are not named parties to the Indemnity Agreement, and the language of that Agreement cannot fairly be read to protect third parties from the type of harm asserted by creditors here.

The Committee next argues that the court should enforce the Indemnity Agreement because such action is necessary to avoid an absurd result. Creditors would be better off if the Freeman Claim became an allowed unsubordinated claim, because then the Indemnity Agreement would clearly be triggered, the Purchasers would have to pay Mr. Freeman, and the funds currently held in the Freeman Reserve would be released to creditors. It is absurd, the Committee argues, for other creditors to suffer delay because the Freeman Claim has **not** been allowed.

This argument is unpersuasive. The outcome the Committee complains of is not absurd. This is so, because all parties assumed that the Freeman Claim would be contested, because the creation of a disputed claims reserve is a customary feature of chapter 11 plans that often delays payment of allowed claims, and because the Indemnity Agreement does not require the Purchasers to protect creditors against delay caused by the operation of a disputed claims reserve.

Finally, the Committee argues that the parties' performance indicates that the Indemnity Agreement requires the Purchasers to fund the Freeman Reserve. The Committee notes that the Purchasers have paid on a current basis the attorneys' fees incurred in contesting the Freeman Claim. This course of conduct, the Committee argues, indicates that the Purchasers acknowledge that the Indemnity Agreement has been triggered.

This argument is unpersuasive, because the payment of attorneys' fees arises under the Purchaser's duty to defend the Estate against the Freeman Claim. That duty to defend arose immediately upon Mr. Freeman's assertion of a claim against the Estate, and is separate from the duty to hold the Estate harmless from the Freeman Claim, which arises only when the claim becomes enforceable.

**\*\*END OF MEMORANDUM\*\***